Morris Allen SMITH, et al.

v.

John ARMSTRONG, et al.

No. 3:93CV1537(JGM).

United States District Court,
D. Connecticut.

Sept. 16, 1996.

Philip D. Tegeler, Connecticut Civil Liberties Union Foundation, Hartford, CT, for Morris Allen Smith, III.

Mark H. Robinson, Cheshire, CT, pro se.

James Doyle, Cheshire, CT, pro se.

Penny Q. Seaman, Tanya F. Clark, Bonnie L. Patten, Wiggin & Dana, New Haven, CT, Philip D. Tegeler, Connecticut Civil Liberties Union Foundation, Hartford, CT, for Jesus Ramos.

Penny Q. Seaman, Tanya F. Clark, Bonnie L. Patten, Wiggin & Dana, New Haven, CT, Philip D. Tegeler, Connecticut Civil Liberties Union Foundation, Hartford, CT, Martha Stone, Childrens' Rights, Inc., New York

City, for Robert Craig, Paul Fine, Misael Diaz, Dennis Hodge.

Tanya F. Clark, Wiggin & Dana, New Haven, CT, for Floyd X. Simms.

Raymond J. Cerilli, Cheshire, CT, pro se.

Steven R. Strom, Stephen J. O'Neill, Attorney General's Office, Public Safety & Special Revenue, Hartford, CT, Jane R. Rosenberg, Ann E. Lynch, Attorney General's Office, Hartford, CT, for Larry R. Meachum, Leonard Barbieri, Frank M. Crose, James E. Huckabey, Michael B. Bonzagni.

Steven R. Strom, Attorney General's Office, Public Safety & Special Revenue, Hartford, CT, for John Armstrong, Dominic Mandano, Michael Donahue, Scott Hadlock, Beth Halleran, John Doe, Dept. of Corrections, State of Connecticut.

## MEMORANDUM OF DECISION

MARGOLIS, United States Magistrate Judge.

On August 3, 1993, plaintiffs, inmates at the Connecticut Correctional Institution at Cheshire ["CCIC"], filed this *pro se* action alleging defendants[1] violated their constitutional right of access to the courts. (Dkt.# 6). On February 2, 1994, plaintiffs filed a motion for class certification. (Dkt.# 20). Counsel appeared on behalf of plaintiffs on February 7, 1994. (Dkt.# # 24–25). On March 1, 1994, with permission of the Court (*see* 3/1/94 endorsement on Dkt. # # 18 & 22), plaintiffs filed an amended class action complaint adding additional defendants and including not only CCIC, but also the Garner Correctional Institution in Newtown ["Garner CI"], the MacDougall Correctional Institution in Suffield ["MacDougall CI"] and the New Haven Correctional Center ["NHCC"]. (Dkt.# 28). Plaintiffs allege in Count One of their complaint that defendants' failure to provide them with effective and meaningful legal assistance violates their rights to due process and access to courts guaranteed by the First and Fourteenth Amendments. (Amended Complaint ¶ 58). In Count Two, plaintiffs allege that by

---

1. Pursuant to Fed.R.Civ.P. 25(d)(1), John Armstrong, the present Commissioner of Corrections, is automatically substituted for Larry R. Meachum, the Commissioner when this action was filed.

providing effective legal assistance to women inmates at the Niantic Correctional Institution ["CCIN"], defendants violate their right to equal protection under the Fourteenth Amendment. (*Id.* ¶ 60). On August 31, 1995, this Magistrate Judge filed a Recommended Ruling granting plaintiffs' motion for class certification, which was adopted on September 20, 1995 by Chief Judge Peter C. Dorsey over defendants' objection. (*See* Dkt. # 105 & 9/20/95 endorsement thereon; Dkt. # 106).

By consent of counsel (Dkt.# 113, ¶ 16),[2] a bench trial was held before this Magistrate Judge on December 4–8, 11–13, 1995. (Dkt.# # 124–30, 132, 141–48).[3] On March 12, 1996, the parties filed their post-trial briefs. (Dkt.# 153–54). On April 19, 1996, the parties filed their post-trial reply briefs. (Dkt.# 158–59). On July 9 and 10, 1996, defendants and plaintiffs, respectively, filed supplemental post-trial briefs in light of *Lewis v. Casey,* — U.S. —, 116 S.Ct. 2174, 135 L.Ed.2d 606 (1996), issued by the United States Supreme Court on June 24, 1996. (Dkt.# # 160–61). On July 17, 1996, the parties filed further post-trial reply briefs. (Dkt.# # 162–63).

## I. FINDINGS OF FACT

The following constitutes this Court's findings of fact, pursuant to Fed.R.Civ.P. 52(a):

The Connecticut Department of Corrections ["DOC"], administered by the Commissioner of Correction ["Commissioner"], oversees all aspects of the correctional system in the State of Connecticut. (12/12/95 Tr. at 40). Commissioner John Armstrong has served as DOC Commissioner since January 1995, replacing Commissioner Larry Meachum. (12/12/95 Tr. at 37). The Commissioner is responsible for a budget of approximately $418 million and for the overall administration and operation of the DOC's twenty-three correctional institutions in which approximately 15,000 inmates are confined. (12/12/95 Tr. at 37; 12/13/95 Tr. at 4–5, 7). The average daily population in 1993–94 was approximately 1,286 inmates for CCIC, 680 inmates for Garner CI, 934 inmates for MacDougall CI, and 758 inmates for NHCC. (Exh. 141 at 8–9, 12–13). More than half of the inmate population has "educational needs" in that they lack either a high school diploma, skill or vocational trade. (12/13/95 Tr. at 9; 12/4/95 Tr. at 49–50; Exh. 141 at 19). Approximately 1266 inmates suffer from mental illnesses. (12/8/95 Tr. at 24; 12/13/95 Tr. at 9–10).

## A. LEGAL ASSISTANCE TO PRISONERS

When this action was filed, DOC assisted inmates in obtaining access to courts by contracting with the Connecticut Prison Association ["CPA"], a nonprofit organization that provides various programs for prisoners. (12/5/95 Tr. at 9–10; Exh. 140). CPA in turn provided legal services through Legal Assistance to Prisoners ["LAP"] which it has operated since 1972. (12/5/95 Tr. at 12). Under these contracts, CPA agreed to provide civil legal assistance, through LAP, to inmates in all DOC facilities in a variety of cases including family matters, deportations and civil rights matters.[4] (12/12/95 Tr. at 50; Exh. 12, 140). These services included assisting prisoners in preparing legal documents, trying cases and handling appeals. (12/5/95 Tr.

---

**2.** The parties further agreed that any appeal would be taken to the Second Circuit.

**3.** These transcripts will be referred to as "12/5/95 Tr.," "12/6/95 Tr.," etc. The trial could, and should, have been considerably shortened, if counsel had been able to circumvent their obvious personality conflicts and instead entered into stipulations of facts.

**4.** In the DOC contract, CPA agreed to:

Provide civil legal assistance to indigent inmates incarcerated in all Department of Correction facilities. Services to include direct access to attorneys via request and referral access through counselors for civil legal problems; criminal matters will not be handled. Services to include but not necessarily limited to the following cases: divorces, support, custody, visitation, termination of parental rights, paternity actions, motor vehicle, property recovery, bankruptcy, torts, probate, deportation, claims commission, parole board, pardon board, time computation, administrative problems, civil rights matters. Contractor also agrees to have an attorney assigned to CCIN for the express purpose of handling family matters for women. . . .
Exh. 140, 7/1/91–6130192 Contract.

at 148–49). LAP operated with a budget which ranged from approximately $130,000 in 1975 to approximately $600,000 in 1995. (12/5/95 Tr. at 14–15; 12/12/95 Tr. at 58–59; Exh. 140). Connecticut Superior Court Judge Raymond Norko, a member of the CPA board of directors since 1989, testified that LAP received all of its funding from the DOC. (12/5/95 Tr. at 9, 12).[5] LAP occasionally sought additional funding from the CPA's general funds to "patch in holes" in its budget. (12/5/95 Tr. at 12–13). In fiscal year 1994–95, the budget increased by $226,386 over the previous year. (12/5/95 Tr. at 34–35; 12/12/95 Tr. at 58–59; Exh. 8).

In December 1992, LAP employed four attorneys, two paralegals and one secretary. (12/5/95 Tr. at 15; Exh. 248 at 65). By July 1994, the staffing had increased to five attorneys, one program manager, two full-time and one part-time paralegal, and one full-time and one part-time secretary. (12/6/95 Tr. at 14–15). Many of the LAP attorneys were inexperienced and turnover was high due to difficult and demanding case loads and "very insignificant" salaries which fell below the starting salaries of other legal services positions. (12/5/95 Tr. at 17–18; 12/6/95 Tr. at 17–18, 23–28; Exh. 248 at 85). CPA was unable to fund salary increases for LAP attorneys due to lack of funds. (12/5/95 Tr. at 18–19).

On June 2, 1993, Gordon Bates, Executive Director of CPA, wrote a letter to Commissioner Meachum discussing LAP's funding problems. (12/5/95 Tr. at 19–20, Exh. 75). CPA suggested reducing "the program by one attorney *and* reduc[ing] services provided by the remaining four" LAP attorneys. (12/5/95 Tr. at 23; Exh. 75) (emphasis in original). The Commissioner responded that he would reduce LAP's budget by twenty percent if LAP eliminated one attorney. (12/5/95 Tr. at 21–22, 25). The budget issue was ultimately resolved with a funding increase of $30,000, resulting in a 1993–94 fiscal year budget roughly $9000 more than the 1992–93 budget. (12/5/95 Tr. at 22–23, 25, 34).

Due to an increasing number of requests for legal services and an existing backlog of cases, LAP instituted a moratorium in February 1994. (12/5/95 Tr. at 25–26, 28, 145; Exh. 9). During this moratorium, LAP refused to accept new cases, concentrating instead on controlling their present caseload and handling emergencies. (12/5/95 Tr. at 26). LAP received approximately three hundred inquiries from inmates looking for assistance during this time; it responded by mailing approximately one hundred moratorium letters declining to accept new non-emergency cases. (Tr. 12/5/95 at 27–28; 12/6/95 Tr. at 29–31, 45; Exh. 4, 7, 26–34, 36–48, 51–67, 109, 250).[6] LAP did not maintain a list of those inmates by whom they were contacted during the moratorium, nor did they attempt to contact these inmates after the moratorium was lifted. (12/5/95 Tr. at 54–55; 12/6/95 Tr. at 31).

Shortly after the moratorium was in place, Judge Norko contacted DOC to request an increase in LAP's funding. (12/5/95 Tr. at 29, 37). Judge Norko, Bates, and Maureen Price of CPA met with then Commissioner Meachum, Commissioner Armstrong and Assistant Attorney General ["AAG"] Stephen O'Neill to discuss "the continuous problem of demand [for legal services] exceed[ing] the ability of lawyers to provide." (12/5/95 Tr. at 30; 12/12/95 Tr. at 47–49). At the time, DOC was aware that the *Smith v. Meachum* lawsuit had been filed. (12/5/95 Tr. at 29). Judge Norko testified that at this meeting, he raised the possibility of LAP's inability to meet all demands for its services despite an increase in its budget; in time LAP would know if the budget increase would suffice. (12/5/95 Tr. at 33–34). Commissioner Armstrong testified that "the central theme and primary purpose" of these negotiations was to ensure that LAP would "provide legal assistance to prisoners ... at a reasonable cost" and to attest, in affidavit form, that LAP was doing so. (12/12/95 Tr. at 50, 52). The Commissioner also testified he was "promised complete satisfaction of the con-

---

**5.** Judge Norko was a very impressive witness.

**6.** *Cf.* Exh. 248(92), LAP's Annual Report dated 7/1/93–6/30/94, stating LAP received "1,426 in-

coming letters during the period of March 1, 1994 to June 30, 1994."

tract" by Bates and by Judge Norko. (12/12/95 Tr. at 60–61). CPA proposed a total additional budget for LAP of $226,386 which DOC approved. (12/5/95 Tr. at 34–35; 12/12/95 at 58–59; Exh. 8). LAP rescinded its moratorium in August 1994, approximately six to seven weeks after DOC approved the budget increase. (12/5/95 Tr. at 28, 39–40).

Judge Norko testified that in August or September 1994, DOC, through the Attorney General's ["AG's"] Office, asked Margaret Wittig, LAP's managing attorney, to provide an "unqualified" affidavit for the *Smith v. Meachum* case. (12/5/95 Tr. at 40–41, 43; 12/12/95 Tr. at 64). The AG's Office prepared an affidavit, which according to Judge Norko, required Attorney Wittig to aver that LAP was providing legal "services to all people at all times under all conditions."[7] (12/5/95 Tr. at 40, 43, 46–47; 12/12/95 Tr. at 64–65; Exh. 118, 124). LAP was not comfortable executing such an affidavit and instead suggested an affidavit averring that LAP would provide legal services "within human dimensions, within reason, within the resources available."[8] (12/5/95 Tr. at 41, 43; Exh. 101). In response, on September 21, 1994, the AG's Office wrote Bates requesting LAP comply with its contract, "including satisfactory handling of all matters necessary to meet the Commissioner's constitutional obligation to provide inmates with a right of access to court and your willingness to attest to that fact." (Exh. 123; 12/12/95 Tr. at 65; 12/5/95 Tr. at 43). If LAP did not comply "with the terms of the contract, and to so attest in accordance with the demands by the Department" within thirty days, DOC would cancel the contract. (Exh. 123; 12/5/95 Tr.

at 44–45). Threatened with termination of the LAP contract, CPA directors and LAP lawyers met with various people in the AG's Office to attempt to agree on language for the affidavit. (12/5/95 Tr. at 54; 12/12/95 Tr. at 65–66). After much negotiation, including reducing the services LAP would provide, Attorney Wittig signed the requested affidavits; the termination notice was rescinded in mid-October 1994. (12/5/95 Tr. at 46, 54–56; Exh. 110, 112, 113).

On October 17, 1994, United States Magistrate Judge Thomas P. Smith granted LAP's motions to compel discovery and for sanctions in *Lepley v. Crose,* 3:93CV1443(TFGD); he awarded LAP $533.33 in attorney's fees. (Exh. 132). The defendants in *Lepley,* a case brought by a prisoner against several DOC employees, were represented by the AG's Office. (12/5/95 Tr. at 56–58; 12/6/95 Tr. at 53–57; 12/13/95 Tr. at 28–29). On November 8, 1994, AAG O'Neill wrote to Attorney Wittig to inform her that the state "consider[ed] the existing contract for services with Legal Assistance to Prisoners to be our only obligation to pay for the cost of legal services rendered" by LAP attorneys. (Exh. 132). AAG O'Neill inquired whether LAP "prefer[ed] that the $533.33 be deducted from the amount payable under the existing contract or … prefer[ed] to simply forgo the award of attorneys' fees." (*Id.*). On November 28, 1994, AAG Stephen Sarnoski wrote a similar letter in regard to LAP's motion for attorney's fees as the prevailing party in *King v, Crose,* 3:93CV1273(AHN).[9] (Exh. 133, 12/6/95 Tr. at 58–61; 12/5/95 Tr. at 58–59). This letter prompted CPA to hold a board meeting to discuss the issue of seeking attorney's fees. (12/5/95 Tr. at 58). Although

7. The affidavit drafted by DOC asked Attorney Wittig to aver that by contract CPA " 'shall, at all times during the contract provide legal assistance to inmates who are in the custody of the Commissioner of Correction, which assistance shall be sufficient and adequate at all times to satisfy any legal requirements incumbent upon the Commissioner concerning inmate rights of access to court.' " Exh. 113, ¶ 8.

8. The affidavit LAP suggested stated: "With the resources and staffing provided by the Department of Correction, pursuant to the above-noted contract, it is the commitment of LAP to provide legal services sufficient to 'satisfy any legal re-

quirements incumbent upon the Commissioner [of Correction] concerning inmate rights of access to court' to the best of its ability." (Exh. 101, ¶ 12).

9. LAP attorney Emmett Dwyer, who estimated the attorney's fees in the *King* case as "around $8000," testified that AAG Sarnoski called him and stated that if LAP "were to persist in trying to get fees, that the Department of Corrections would simply not renew their [LAP's] contract, that they would shut us down, I'd be out of a job and my kids would be hungry next year." (12/6/95 Tr. at 59–60; Exh. 137).

CPA believed it had the ability to seek and collect attorney's fees, it never collected its fees in either case. (12/5/95 Tr. at 59–60; 12/6/95 Tr. at 59–60).

In June 1995, CPA learned DOC would seek bids for the legal services contract for fiscal year 1995–96 from other vendors.[10] (12/5/95 Tr. at 61–62). DOC renewed the CPA contract until September 30, 1995, to allow LAP to provide legal services until a new contractor was chosen. (12/5/95 Tr. at 61–63; 12/12/95 Tr. at 74; Exh. 166, 167). LAP was not authorized under the renewed contract to either enter appearances or open new cases after June 30, 1995. (12/5/95 Tr. at 63–64, 98). DOC extended the contract a second time, until December 31, 1995, to permit LAP to dispose of its pending cases. (12/5/95 Tr. at 74–75; 12/12/95 Tr. at 74; 12/13/95 Tr. at 42; Exh. 186).

### B. THE SEARCH FOR A NEW VENDOR

In July 1995, DOC began to search for a new vendor to provide legal assistance to prisoners by issuing a Request for Proposal ["RFP"] for legal services to inmates. (12/12/95 Tr. at 74–75; 12/5/95 Tr. at 62; Exh. 142, 175, 178). In the RFP, DOC sought a contractor to assist inmates in researching legal claims and preparing and filing legal papers. (12/5/95 Tr. at 182–83; Exh. 142, ¶ 1; Exh. 150). DOC did not require the contractor to enter appearances on behalf of inmates, nor did it anticipate that an attorney-client relationship would develop. (12/5/95 Tr. at 181; Exh. 142 at 2, ¶ 1; Exh. 143, ¶ 1). Entering an appearance in a case and actual trial representation by the contractor would be permitted at the Com-

missioner's discretion. (12/5/95 Tr. at 181; Exh. 150 at 2, ¶ 1).

DOC received bid packages from two interested parties. (Exh. 178 at 6). The first bid contemplated fulfilling the contract with a proposed budget of $748,313; the second bid, submitted by Sydney Schulman, contemplated a budget of $710,000. (Exh. 178). Both bids were "far in excess" of DOC's expectations. (Id.). CPA did not submit a bid in response to the RFP, believing that an inherent conflict existed in the RFP, which defined the client as DOC and not the inmate.[11] (12/5/95 Tr. at 72–74). In addition, CPA considered the RFP to be an adhesion contract "favoring severely" DOC and sacrificing the independence of the attorneys. (12/5/95 Tr. at 73–74). CPA did, however, submit a bid to provide legal services in current cases. (12/5/95 Tr. at 74; Exh. 178 at 2; Exh. 184). DOC did not accept CPA's proposal. (12/5/95 Tr. at 75).

DOC ultimately accepted a revised bid submitted by Attorney Schulman. (12/5/95 Tr. at 175–76; 12/12/95 Tr. at 75; Exh. 176). In order to address the evaluation committee's financial concerns, Attorney Schulman was asked to revise his budget so that it would depend more upon paralegals and less upon attorneys. (12/5/95 Tr. at 179; Exh. 178). Attorney Schulman ultimately presented a proposal with a $560,268 budget; DOC awarded him the contract with a budget of $571,323.86. (12/12/95 Tr. at 75; Exh. A; Exh. 177; Exh. 178 at 6).

### C. INMATES LEGAL ASSISTANCE

DOC's one year contract with Attorney Schulman to provide legal services through

---

**10.** For the past ten years, contract negotiations began in April for the following fiscal year, which commenced in July. (12/5/95 Tr. at 61). In 1995, DOC did not notify CPA until the "last moment" that it would not renew its contract. (Id.). CPA was told it "had the choice, as anyone else, to bid on the contract." (Id. at 62).

This incident is but one of the many examples of the heavy handed and offensive treatment of CPA by DOC and the AG's Office. In light of DOC's extensive dealings with CPA, it would have been a matter of common courtesy to inform CPA of its intentions to seek other vendors for the contract. This Court also finds the treatment of CPA by DOC and the AG's Office repre-

hensible with respect to the issue of collecting attorney's fees, to which LAP was clearly entitled; with respect to threats made by members of the AG's Office to LAP attorneys; and with respect to the execution of affidavits by LAP attorneys and the threatened termination of the CPA contract if the affidavits were not forthcoming. (See e.g., Exh. 123 & 124).

**11.** The contract ultimately signed stated "under the terms of this agreement and for the purpose of defining a 'client-attorney' relationship, the inmate to whom assistance is provided will be the client." (Exh. 177 & A, Part II, ¶ 2).

Inmates Legal Assistance ["ILA"] commenced on November 1, 1995; ILA was not fully operational until December 1, 1995. (Exh. A at 14; Exh. 177 at 14; 12/11/95 Tr. at 62, 73–74; 12/13/95 Tr. at 32). In a letter dated November 27, 1995, DOC notified inmates that LAP had been replaced by a new legal service provider; the letter included ILA's toll free number. (12/4/95 Tr. at 60–61, 96–98; 12/8/95 Tr. at 47–48; 12/11/95 Tr. at 27–29, 73; Exh. C). At the time of this trial, ILA employed one full-time managing attorney, three full-time staff attorneys, a senior administrative secretary, two paralegals, one investigator and one part-time law student. (12/5/95 Tr. at 186; 12/11/95 Tr. at 62–65). Fully staffed, ILA will employ an additional paralegal and part-time law student. (12/11/95 Tr. at 62). Three of the full-time attorneys, the senior administrative secretary, and one of the paralegals previously worked for LAP. (12/11/95 Tr. at 63–64).

Under the terms of its contract with DOC, ILA is to provide "inmates with access to the judicial system through advice, counsel and physical preparation of meaningful legal papers." (Exh. A & 177 at 14, ¶ 5). This legal assistance "does not include representation and/or entering an appearance in a case or extend to the actual trial of the claim." (*Id.*). ILA is also required to provide affidavits, at the Commissioner's request, which aver it is providing "sufficient and adequate [legal assistance] at all times to satisfy any legal requirements incumbent upon the Commissioner concerning prisoner rights of access to court." (*Id.* at 8, ¶ 2). The contract prohibits ILA from discussing with inmates the "operation of the institution" and requires it to disclose any information involving "the safety or security of the institution" to the DOC. (*Id.* at 12, ¶ 13(C)).

Plaintiffs' expert witness on legal ethics, Professor James Trowbridge of Quinnipiac College School of Law, testified that the ILA contract raised "real questions of professional responsibility." (12/8/95 Tr. at 79–80). Professor Trowbridge believed that by failing to permit attorneys to enter appearances in cases, the contract created a situation where attorneys were neither "identifying themselves [to the court] [n]or taking responsibility" for their work product. (12/8/95 Tr. at 79). Professor Trowbridge further testified that ethical implications were raised by ILA's obligation to provide affidavits at the Commissioner's request; he opined that it was "a problem" to contractually commit to provide an affidavit and to agree to its content "as to some future state of affairs." (12/8/95 Tr. at 82). In discussing Part II, ¶ 13(C) of the contract, Professor Trowbridge concluded that prohibiting ILA attorneys from discussing the operations of the institutions "put a significant restriction on the attorney's ability to assess and advise" the client. (12/8/95 Tr. at 76; Exh. A & 177 at 12). Finally, Professor Trowbridge testified that Part II, ¶ 13(C) of the contract, which states that information "which involves the safety or security of the institution or the community shall not be privileged," raised ethical concerns in that this provision was broader than "the limited exceptions to confidentiality that appear in the Rules of Professional Conduct at 1.6." (12/8/95 Tr. at 76–77).

## II. CONCLUSIONS OF LAW

The following constitutes this Court's conclusions of law, pursuant to Fed.R.Civ.P. 52(a):

It is well established that inmates have a constitutionally protected right to access to the courts. *Bounds v. Smith,* 430 U.S. 817, 822–25, 97 S.Ct. 1491, 1495–97, 52 L.Ed.2d 72 (1977); *Lewis v. Casey,* — U.S. —, —, 116 S.Ct. 2174, 2179, 135 L.Ed.2d 606 (1996), *citing Bounds,* 430 U.S. at 817, 821, 828, 97 S.Ct. at 1492, 1494–95, *also citing Johnson v. Avery,* 393 U.S. 483, 484, 489–90, 89 S.Ct. 747, 748, 750–51, 21 L.Ed.2d 718 (1969). " 'Meaningful access' to the courts is the touchstone" which assures that defendants have the opportunity to adequately present their claims. *Bounds,* 430 U.S. at 823, 97 S.Ct. at 1495–96 (citation omitted). Reaffirming its decision in *Younger v. Gilmore,* 404 U.S. 15, 92 S.Ct. 250, 30 L.Ed.2d 142 (1971),[12] the Court in Bounds held that

---

**12.** In *Younger v. Gilmore,* the Court affirmed the judgment of the District Court, relying on *John-*

the "fundamental constitutional right of access to the courts requires prison authorities to assist inmates in the preparation and filing of meaningful legal papers by providing prisoners with adequate law libraries or adequate assistance from persons trained in the law." *Bounds,* 430 U.S. at 828, 97 S.Ct. at 1498. *Bounds* did not establish, however, an inmate's "right to a law library or to legal assistance[;] ... [t]he right that Bounds acknowledged was the (already well-established) right of *access to the courts." Lewis,* — U.S. at ——, 116 S.Ct. at 2179 (emphasis in original).

The Court recently clarified its *Bounds* decision in *Lewis,* in which petitioners, officials of the Arizona Department of Corrections, challenged the Arizona District Court's ruling in favor of the respondent class, adult inmates in the Arizona DOC. The District Court held petitioners had deprived respondents of meaningful access to courts and ordered "sweeping changes designed to ensure" such access. *Lewis,* — U.S. at ——, 116 S.Ct. at 2178.[13] The U.S. Supreme Court reversed, concluding that the trial court's finding of actual injury as to one named plaintiff was "a patently inadequate basis for a conclusion of systemwide violation and imposition of systemwide relief." *Id.* at ——, 116 S.Ct. at 2184. The Court reiterated that *"Bounds* does not guarantee inmates the wherewithal to transform themselves into litigating engines capable of filing everything from shareholder derivative actions to slip-and-fall claims." *Lewis,* — U.S. at ——, 116 S.Ct. at 2182. Instead, it requires the state to provide inmates with the tools they need "in order to attack their sentences, directly or collaterally, and in order to challenge the conditions of their confinement. Impairment of any *other* litigating capacity is simply one of the incidental (and perfectly constitutional) consequences of conviction and incarceration." *Id.* (emphasis in original).

## A. ACTUAL INJURY

■ "[A]n inmate alleging a violation of *Bounds* must show actual injury." *Lewis,* — U.S. at ——, 116 S.Ct. at 2179. The actual "injury requirement is not satisfied by just any type of frustrated legal claim." *Lewis,* — U.S. at ——, 116 S.Ct. at 2181. Nor is relevant actual injury shown by an inmate who simply establishes "that his prison's law library or legal assistance program is sub-par in some theoretical sense." *Lewis,* — U.S. at ——, 116 S.Ct. at 2180. An inmate who claims actual injury "must go one step further and demonstrate that the alleged shortcomings in the library or legal assistance program hindered his efforts to pursue a legal claim." *Id.*

At trial, plaintiffs attempted to establish relevant actual injury in violation of *Bounds* through the testimony of inmates Paul Fine, housed in Garner CI, Robin Spearman, also housed at Garner CI,[14] Claudius Channer, housed at MacDougall CI, and Tobias Anderson, housed at NHCC.[15] Fine testified that he is housed in a "closed block" and therefore is unable to go to the law library; he can request books from the librarian and legal forms from the "legal clerk" on a weekly basis. (12/4/95 Tr. at 21–24, 26–27). He further testified that he attempted to obtain counsel to represent him in a review of his sentence, in connection with the termination of his parental rights, and in an assault case against several correctional officers. (12/4/95 Tr. at 28–29, 35–38, 54–59). On cross examination, Fine acknowledged he never contacted his public defender and was unaware the

son v. Avery, 393 U.S. 483, 89 S.Ct. 747, 21 L.Ed.2d 718 (1969), holding states have a constitutionally mandated duty to provide inmates with either law libraries or inmate legal assistance programs. *Bounds,* 430 U.S. at 817, 828–29, 97 S.Ct. at 1492–93, 1498–99.

13. The District Court adopted a twenty-five page injunctive order specifying "in minute detail the times that libraries were to be kept open, the number of hours of library use to which each inmate was entitled (10 per week), the minimal educational requirements for prison librarians (a library science degree, law degree or paralegal degree), the content of a videotaped legal-research course for inmates (to be ... funded by ADOC) and similar matters." *Lewis,* — U.S. at ——, 116 S.Ct. at 2178.

14. Mr. Spearman was previously housed in Cheshire CI.

15. Mr. Anderson was previously housed at Cheshire CI, MacDougall CI and Garner CI.

**48**

public defender could represent him in his sentence review case; he admitted he was represented by an attorney in the termination of his parental rights case. (12/4/95 Tr. at 54–58). Fine also admitted he was represented by counsel in his assault case, although he believed his attorney did not assist him promptly.[16] (*Id.* at 58–59).

Spearman, also housed in a closed block, testified as to his difficulties obtaining material from the law library or law clerk. (12/4/95 Tr. at 70–78). He further testified that he had filed a case in federal court without the assistance of counsel. (12/4/95 Tr. at 101–02). Spearman wrote to LAP and asked for assistance with his case; David Rozwaski, an LAP attorney, replied that expert medical testimony was necessary to prove his claim and that LAP did "not have access to a medical expert." (Exh. 10, 12/4/95 Tr. at 108–09 ). On cross examination, Spearman testified he had met with Jeffrey Dowd, another LAP attorney, who advised him on how to pursue his claim. (12/4/95 Tr. at 109, 117–18). The District Court dismissed his case without prejudice; Spearman appealed to the Second Circuit. (Exh. # # 296–309).

Channer testified he wrote to LAP, as well as to Yale University, "and a couple of other places" asking for assistance in a case in which he sought to sue DOC to gain access to the law library at Walker to pursue his immigration claim. (12/7/95 Tr. at 184–85; 192–93; Ex. 265).[17] LAP told him they could not take his case due to their moratorium. (12/7/95 Tr. at 183, 193; Exh. 259). Channer testified that he was represented in his state habeas case.[18] (12/7/95 Tr. at 184).

Anderson testified that he presently had four cases pending in court and had attempted to obtain legal assistance from various private attorneys, the University of Connecticut Law School, the Connecticut Civil Liberties Union and Legal Aid in Enfield and Hartford. (12/11/95 Tr. at 15–16). Although

he did not attempt to contact LAP regarding these four pending cases, he did contact them to assist him in filing a case dealing with access to courts, "transfers, law libraries, [and] legal assistance" and to request copies and envelopes. (12/11/95 Tr. at 20–21). LAP responded with a moratorium letter. (12/11/95 Tr. at 21; Exh. 265). Using a form complaint, Anderson filed his access to court case; he also amended his complaint. (Exh. 203–04). On cross examination, Anderson testified that the court dismissed his case and he appealed to the Second Circuit. (12/11/95 Tr. at 39–40; Exh. 211). He further stated he had written to ILA and requested they send him specific cases, although he did not ask them to research his legal problem. (12/11/95 Tr. at 52–53).

■ Plaintiffs have failed to establish relevant actual injury in violation of *Bounds.* Each plaintiff testified about his difficulties in obtaining books from the law library or from the law clerk. Several plaintiffs testified they received moratorium letters from LAP. Nevertheless, in order to allege actual injury in violation of Bounds, it is insufficient for plaintiffs merely to establish that their "prison's law library or legal assistance program is sub-par in some theoretical sense." *Lewis,* — U.S. at ——, 116 S.Ct. at 2180. Instead, to prove actual injury, plaintiffs must "demonstrate that the alleged shortcomings in the library or legal assistance program hindered [their] efforts to pursue a legal claim." *Id.* In this case, the State of Connecticut relied on LAP to fulfill its legal obligation to provide inmates with access to courts. Plaintiffs presented no evidence indicating that LAP's numerous shortcomings hindered their efforts to pursue their claims; to the contrary, all inmates succeeded in filing claims. Nor did plaintiffs present evidence indicating the court had dismissed their complaints "for failure to satisfy some technical requirement." *Id.* Furthermore, no inmate could show that he had suffered "ar-

---

**16.** Fine believed an LAP attorney was appointed to represent him only after he became a plaintiff this case. (12/4/95 Tr. at 40–41, 58–59).

**17.** At the time, Channer was housed in the Walker Correctional Institution which he testified did not have a law library. (12/7/95 Tr. at 193).

**18.** Channer testified that he had difficulty obtaining information from the law library clerk regarding his state habeas petition after he "decided to fire [his] public defender and go *pro se.*" (12/7/95 Tr. at 188–89; 12/8/95 Tr. at 50).

guably actionable harm that he wished to bring before the courts" but "was unable even to file a complaint" due to inadequacies in the legal assistance program.[19] *Id.* Although Fine and Channer testified as to their inability to obtain legal assistance in immigration cases and cases involving the termination of their parental rights, these violations do not constitute actual injury in violation of *Bounds; Bounds* merely requires the state to provide inmates with the tools they need to "attack their sentences, directly or collaterally, and in order to challenge the conditions of their confinement." *Lewis,* —— U.S. at ——, 116 S.Ct. at 2182. Plaintiffs have not shown their "capability of bringing contemplated challenges to sentences or conditions of confinement before the courts" has been compromised and as a result, have not asserted actual injury. *Id.*

## B. STANDING

██ In order to invoke federal jurisdiction, plaintiffs bear the burden of establishing they have standing to bring their claim. *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560–61, 112 S.Ct. 2130, 2136–37, 119 L.Ed.2d 351 (1992). At a minimum, plaintiffs must establish they have suffered an actual injury, that this injury is "traceable to the challenged action of the defendant," and that this injury will likely be "redressed by a favorable decision." *Id.* (citations and internal quotation marks omitted); *Simon v. Eastern Ky. Welfare Rights Org.,* 426 U.S. 26, 38–39, 96 S.Ct. 1917, 1924–25, 48 L.Ed.2d 450 (1976). The actual "factual allegations of injury resulting from the defendant's conduct ... must be 'supported adequately by the evidence adduced at trial.'" *Lujan,* 504 U.S. at 561, 112 S.Ct. at 2137 (citation omitted); *Lewis,* —— U.S. at ——, 116 S.Ct. at 2183. Even in a class action suit, "named plaintiffs who represent a class 'must allege and show that they personally have been injured, not that injury has been suffered by other, un-

identified members of the class to which they belong and which they purport to represent.'", 426 U.S. at 40 n. 20, 96 S.Ct. at 1925 n. 20 (citation omitted); *Lewis,* —— U.S. at ——, 116 S.Ct. at 2183. Plaintiffs have been unable to assert actual injury, *see Section II.A, supra,* and as such do not have standing to demand the remediation they seek. *Lewis,* —— U.S. at ——, 116 S.Ct. at 2183.

## C. EQUAL PROTECTION

In light of plaintiffs' lack of standing to bring this suit, the court need not reach this issue.

## D. ILA's LACK OF INDEPENDENCE

Plaintiffs, citing *Smith v. Bounds,* 813 F.2d 1299, 1303 (4th Cir.1987), contend ILA fails to satisfy constitutional requirements because it is not "independent from the DOC." Plaintiffs' reliance on this case is misplaced, however, as the proposed contract in *Smith v. Bounds* is clearly distinguishable from the ILA contract. In that case, the District Court found that the proposed contract gave North Carolina's DOC the authority "to hire and fire" attorneys providing legal assistance to inmates, required "the attorneys to maintain their offices in the prisons[,] ... to have their mail and telephone calls sent through prison facilities, to have their offices searched, to submit all budget items to the department, and to conduct their research in the prison libraries." *Smith v. Bounds,* 657 F.Supp. 1327, 1331 (E.D.N.C.1986). The District Court resolved the problem of attorney independence by requiring the DOC to hire a disinterested third party to hire, fire and supervise the inmate attorneys. *Id.* at 1331–32. The Court of Appeals affirmed this decision. *Smith v. Bounds,* 813 F.2d 1299, 1302–03 (4th Cir.1987). The relationship between DOC and ILA does not rise to the level condemned by the court in *Smith v. Bounds.*[20]

---

**19.** Plaintiffs also name inmates Michael Burnette–Bey, Lawrence Williams, Raul Figueroa and Sadettin Zoravali as individuals who were denied access to court. (Dkt. # 161 at 4–5). Despite the fact that the court ultimately ruled against them, each of these plaintiffs was able to file a complaint which the court reviewed. (*See* Dkt. # 161 (PACER printouts)).

**20.** The Court does not dispute that plaintiffs have legitimate concerns about the relationship between DOC and ILA. Of particular concern are the many terms in the ILA contract which appear to question the standards of legal ethics and compromise ILA's ability to provide legal assistance to inmates. For example, this Court agrees with plaintiffs' expert witness that ILA's

**50**

## III. CONCLUSION

For the reasons stated above, judgment shall enter for the defendants.[21]

inability to enter appearances in cases raises ethical issues and creates a situation in which attorneys are preparing documents for the court, but are not identifying themselves or taking responsibility for their work product. (Exh. A & 177 at 14, 1 5; 12/8/95 Tr. at 79). Requiring ILA to aver at some time. in the future that it is providing sufficient legal assistance "at all times to satisfy any legal requirements incumbent upon the Commissioner concerning prisoner rights of access to court," contractually commits ILA to aver to provide services which it may discover it is incapable of fulfilling due to insufficient resources or staff shortages. (Exh. A & 177 at 8, ¶ 2). Furthermore, to preclude attorneys from discussing with inmates the operations of the facilities and to require them to disclose immediately information involving the safety or security of the facility, significantly compromises the attorneys' ability to assess and advise their clients. (Id. at 12, ¶ 13(C)). Likewise, an attorney's inability to take photographs of an inmate precludes the attorney from "a reasonable and lawful means of gathering evidence." (Id. at 13, ¶ 13(L); 12/8/95 Tr. at 81).

Of significant concern is the contract provision which precludes ILA from accepting "cases involving actions against the Department of Correction in matters related to the Care and Custody of inmates, except as requested by the Commissioner." (Id. at 11, ¶ 10). This is in direct contradiction to the U.S. Supreme Court's decision in Lewis, which requires the state to provide inmates with the tools they need "in order to attack their sentences, directly or collaterally, and in order to challenge the conditions of their confinement." Lewis, —— U.S. at ——, 116 S.Ct. at 2182.

Unfortunately, challenges to these provisions are not yet ripe for adjudication at this time.

21. The Court extends its deepest appreciation to the law firm of Wiggin & Dana for representing the plaintiffs in this important litigation.